UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NATHANIEL MCCOY-WINSTON,

           Plaintiff,

   v.

UNITED PARCEL SERVICE, INC.,

           Defendant.

Case No. C20-779-MLP

ORDER

## I. INTRODUCTION

This matter is before the Court on Defendant United Parcel Service, Inc.'s ("UPS") Motion for Summary Judgment ("Defendant's Motion"). (Def.'s Mot. (dkt. # 64).) UPS seeks summary judgment on claims by Plaintiff Nathaniel McCoy-Winston ("Plaintiff") for wrongful termination, in violation of public policy, and workers' compensation retaliation, in violation of RCW 51.48.025. (*Id.* at 1-2.) Plaintiff opposed Defendant's Motion (Pl.'s Resp. (dkt. # 67)) and UPS filed a reply (Def.'s Reply (dkt. # 72)). The Court heard oral argument from the parties on March 1, 2022. (Dkt. # 77.)

Having considered the parties' submissions, oral argument, the balance of the record, and

ORDER - 1

the governing law, Defendant's Motion (dkt. # 64) is DENIED, as explained further below.

## II.  BACKGROUND

### A.  Factual Background

Plaintiff was employed by UPS as a loader/unloader for approximately eight years.[1] (Hammack Decl., Ex. A (dkt. # 68-1) at 7-10 (McCoy-Winston Dep. at 50:11-16, 50:18-21, 52:2-4, 70:18-25)).) As part of his work duties, Plaintiff was required to move packages as they moved toward him on a chute to load them on to UPS trucks. (McCoy-Winston Decl. (dkt. # 70) at ¶ 3.) The chutes require the use of a hydraulic handle to maneuver the chute inside and outside of the UPS trucks. (*Id.* at ¶¶ 3-4.) The hydraulic handles to operate the chutes extend out on to a narrow metal catwalk, which runs along the backdoors of the UPS trucks. (*Id.*)

Per Plaintiff, the equipment, including the chutes, is "well worn and overused." (McCoy-Winston Decl. at ¶ 5.) Plaintiff further notes that the hydraulic chute handles themselves would frequently break and drop down into a lower position than when functioning properly. (*Id.*) Ben Morely and Donald Harper, two of Plaintiff's coworkers, additionally complained of an issue with the hydraulic handles being in a broken lower position and provided letters to UPS outlining the issue.[2] (McCoy-Winston Decl. at ¶ 7; Hammack Decl., Exs. I (dkt. # 68-9) at 2, J (dkt. # 68-10) at 2.) UPS Mechanic Mark Sullivan testified that he was aware of employee complaints of the chute handles being broken, or down too low, and that this was a result of a

---

[1] Plaintiff was originally hired by UPS on October 18, 2006, but voluntarily left on September 17, 2007, before being rehired in 2009. (Hammack Decl., Ex. A at 7-8 (McCoy-Winston Dep. at 50:11-13, 50:18-21, 52:2-4).)

[2] The Court notes that the letters provided by Mr. Morely and Mr. Harper are unsworn documents that appear to have been authored on March 21, 2017, for submission with Plaintiff's grievance through his union. However, the letters were submitted by Defendant with its evidence in support of its Motion (Victorian Decl., Ex. B (dkt. # 65-2) at 1-2) and Defendant did not specifically object to their admissibility or consideration by this Court. *See* Fed. R. Civ. P. 56(c)(2).

ORDER - 2

loss of hydraulic fluid that would need to be periodically added. (Hammack Decl., Ex. F (dkt. # 68-6) at 13-15 (Sullivan Dep. at 39:8-40:10, 43:1-20).)

On January 23, 2017, Plaintiff alleges he was injured after exiting the back of a UPS truck during his shift. (McCoy-Winston Decl. at ¶ 7; Hammack Decl., Ex. A at 5, 16-17 (McCoy-Winston Dep. at 33:7-13, 125:20-126:3).) Plaintiff alleges that he came off a load stand leading out of a UPS truck while working quickly and that he struck a hydraulic handle extending out into the catwalk with his chest. (*Id.*) At the time of his injury, Plaintiff reported the injury to his floor supervisor but believed he could work through it and that it would otherwise heal. (McCoy-Winston Decl. at ¶ 8; Hammack Decl., Ex. A at 14 (McCoy-Winston Dep. at 94:9-14).) However, Plaintiff's injury failed to resolve, and on February 9, 2017, Plaintiff reported the injury to UPS management and sought treatment from his care provider. (McCoy-Winston Decl. at ¶ 8; Hammack Decl., Ex. A at 12-13 (McCoy-Winston Dep. at 92:15-93:7).) Plaintiff's care provider diagnosed him with a chest contusion and recommended that he not work to allow his injury time to heal. (McCoy-Winston Decl. at ¶ 8.) Plaintiff did not return to work until February 18, 2017.[3] (*Id.*)

Upon learning of Plaintiff's injury, on February 10-11, 2017, UPS Division Manager Geoffrey McKenzie sent emails to several UPS employees requesting that Plaintiff's injury be investigated. (Hammack Decl., Exs. L (dkt. # 68-12) at 2 ("We need to get Security, Labor, and Risk Management involved with this injury. We will NOT let this go to the wayside, period!"), Q (dkt. # 68-17) at 3 ("We need to get some traction on this ASAP . . . this sort should not be

---

[3] While working for UPS in August 2015, Plaintiff previously sustained a rotator cuff injury that required surgery and resulted in a workers' compensation claim and leave of absence from November 4, 2015, to October 31, 2016. (McCoy-Winston Decl. at ¶ 13; Hammack Decl., Ex. A at 6 (McCoy-Winston Dep. at 37:6-25).) Plaintiff also previously injured his hand while working for UPS on May 7, 2012 but returned to work on May 18, 2012. (Hammack Decl., Ex. P (dkt. # 68-16) at 2-4.)

ORDER - 3

charged a [loss time] injury.").) Mr. McKenzie sent follow up emails on February 20-21, 2017, continuing to express significant concern about the need to investigate Plaintiff's injury. (Victorian Decl., Ex. C (dkt. # 65-3) at 22 ("I cannot express my passion for this and need for you to dig into this injury."), 24 ("We need to get some teeth in this and question every aspect of this alleged injury . . . we should not be eating the charge for this injury.").)

Mr. McKenzie and UPS Seattle Hub Manager Jason Hell both testified that UPS investigates employee injuries for the purpose of determining the root cause of the injury from a safety perspective for preventative purposes. (Victorian Decl., Exs. C at 5 (McKenzie Dep. at 33:13-24), E (dkt. # 65-5) at 6-7 (Hell Dep. at 43:21-44:15).) Mr. McKenzie additionally testified that UPS managers are reviewed annually and that one metric impacting their review is based on the frequency of injuries to employees per hours worked. (Hammack Decl., Ex. B (dkt. # 68-2) at 10-11 (McKenzie Dep. at 68:9-20, 70:11-71:2).) Plaintiff's Supervisor Cory Christopher testified that UPS tracks workers' compensation claims as a line item in its cost statements, that such claims are paid out of a hub's costs across the year, but that he has never received a review on the basis of such costs exceeding the hub's budget. (Hammack Decl., Ex. D (dkt. # 68-4) at 5-6 (Christopher Dep. 73:13-74:10); Second Victorian Decl., Ex. C (dkt. # 73-3) at 6-7, 10 (Christopher Dep. at 75:13-76:10, 82:10-20).) UPS Business Manager Rick Aholelei testified that UPS division managers regularly compete amongst divisions to keep injuries down and were incentivized to do so by being awarded monthly celebrations. (Hammack Decl., Ex. E (dkt. # 68-5) at 5 (Aholelei Dep. at 46:3-23).)

ORDER - 4

On February 11, 2017, Plaintiff was interviewed by Mr. Hell regarding his injury and pictures were taken of Plaintiff standing next to a chute handle.[4] (McCoy-Winston Decl. at ¶¶ 9-10; Victorian Decl., Ex. B (dkt. # 65-2) at 10; Hammack Decl., Ex. R (dkt. # 68-18) at 3-4.) Both Mr. Hell, who previously worked as loader/unloader for UPS, and Mr. Sullivan testified that they had never heard of an employee injuring themselves on a chute handle. (Victorian Decl., Exs. E at 22-23 (Hell Dep. at 96:13-22), I (dkt. # 65-9) at 7 (Sullivan Dep. at 46:12-16).) As part of its investigation, UPS Labor Manager Thad Collins tasked UPS employees to investigate any recent police activity involving trauma to the chest that may have occurred relative in time to when Plaintiff suffered his injury. (Victorian Decl., Ex. C at 17-18.) Based on UPS's investigation, UPS concluded Plaintiff's injury could not physically have occurred in the manner Plaintiff indicated based on his height and the height of the chute handle. (Hammack Decl., Exs. Q at 2-5, R at 2-4, S (dkt. # 68-19) at 2; Victorian Decl., Exs. E at 22-23 (Hell Dep. at 100:25-101:11), F (dkt. # 65-6) at 5-6 (Christopher Dep. at 68:21-69:19).)

On February 24, 2017, UPS Claims Manager Gallagher Basset issued a letter denying Plaintiff's workers' compensation claim noting, "there is no proof of a specific injury at a definite time and place in the course of employment." (Hammack Decl., Ex. U (dkt. # 68-21) at

---

[4] The parties disagree as to which precise chute handle allegedly injured Plaintiff. Plaintiff argues that he was injured by the chute handle located at Door 55. (Pl.'s Resp. at 3, 12, 18; *see also* McCoy-Winston Decl. at ¶ 7.) Defendants contend that Plaintiff was either injured by the chute handle located at Door 49 or 52, but that it is otherwise immaterial because Plaintiff failed to provide evidence that any chute handle could reach low enough to connect with his chest. (Def.'s Mot. at 6; Def.'s Reply at 3, 7-8; *see also* Victorian Decl., Ex. F at 5-6 (Christopher Dep. at 77:24-78:22).) UPS additionally submitted work orders that demonstrate the only chute handles reported as broken in proximity to when Plaintiff's injury occurred were located at Door 38 and Door 52, both of which UPS claims were repaired before Plaintiff allegedly injured himself, and that there is no evidence in the record that the handle at Door 55 was broken. (Def.'s Reply at 7 (citing Victorian Decl., Ex. B at 6).)

ORDER - 5

2.) As a result, on March 2, 2017, the Washington Department of Labor & Industries ("DOLI") denied Plaintiff benefits.[5] (Victorian Decl., Ex. G (dkt. # 65-7) at 4-5 (Hell Decl. at ¶ 18).)

On March 16, 2017, Mr. McKenzie scheduled a meeting with Plaintiff where he was informed that he was suspended pending UPS's investigation. (McCoy-Winston Decl. at ¶ 11; Victorian Decl., Ex. G at 5 (Hell Decl. at ¶ 20).) The next day, on March 17, 2017, Plaintiff was terminated by UPS on the basis of "proven dishonesty" for raising a false claim of injury. (McCoy-Winston Decl. at ¶ 12, Ex. A (dkt. # 70-1) at 2.) However, per the record that same day, Mr. Hell sent an email to Mr. McKenzie stating that he "had to adlib on this, there was not a proven dishonestly w/l on the site."[6] (Hammack Decl., Ex. W (dkt. # 68-23) at 2.)

On March 21, 2017, Plaintiff filed a grievance through his union regarding his termination. (Hammack Decl., Ex. EE (dkt. # 68-31) at 2.) Plaintiff's grievance was later withdrawn due to Plaintiff's lack of participation, and his termination was upheld on April 13, 2017. (Victorian Decl. (dkt. # 65-1), Exs. A at 15, B at 5.) Plaintiff alleges he was not aware of a hearing to be held on his grievance because he did not hear from his union representative "for a while" after his termination. (McCoy-Winston Decl. at ¶ 14.)

### B. Procedural Background

On May 22, 2020, UPS removed this matter from the King County Superior Court. (Not. of Removal (dkt. # 1).) Plaintiff's complaint alleges two causes of action: (1) wrongful

---

[5] On March 28, 2017, DOLI granted Plaintiff benefits on reconsideration. (Hammack Decl., Ex. X (dkt. # 68-24) at 2-4.) Plaintiff's physician submitted that he had made an error on a form submitted to DOLI that failed to note that Plaintiff's diagnosis was caused by a specific injury on a more probable than not basis. (*Id.*, Ex. V (dkt. # 68-22) at 2.) On April 20, 2017, DOLI reversed their reconsideration and denied Plaintiff benefits based on additional evidence submitted by UPS. (*Id.*, Ex. Y (dkt. # 68-25) at 2.) On October 24, 2017, DOLI again reversed its decision and granted Plaintiff benefits on reconsideration. (*Id.*, Ex. BB (dkt. # 68-28) at 2.)

[6] There is no clarification in the record as to the meaning of "w/l" in Mr. Hell's email. At oral argument, UPS asserted the term meant "written letter." (*See* dkt. # 77.)

ORDER - 6

1  discharge, in violation of public policy; and (2) retaliation, in violation of RCW 51.48.025.

2  (Compl. (dkt. # 1-1) at 3.) On May 29, 2020, UPS filed its Answer. (Answer (dkt. # 9).)

3        On January 10, 2022, UPS filed the instant Motion. (Def.'s Mot.) On February 7, 2022,

4  after an extension of time, Plaintiff filed his response. (Pl.'s Resp.) On February 11, 2022, UPS

5  filed its reply, which contained motions to strike requesting the Court to strike photographs and a

6  portion of two declarations submitted with Plaintiff's Response. (Def.'s Reply.) On February 21,

7  2022, Plaintiff filed a Surreply. (Pl.'s Surreply (dkt. # 75).) This matter is now ripe for the

8  Court's review.

## III.  DISCUSSION

10        UPS argues it had a legitimate, non-discriminatory basis for terminating Plaintiff

11  following a finding of "proven dishonesty," which was in violation of UPS policy and Plaintiff's

12  collective bargaining agreement.[7] (Def.'s Mot. at 10.) UPS contends its internal investigation

13  revealed that the chute handle, even at its lowest point, was too high to strike Plaintiff in his

14  chest and that Plaintiff failed to otherwise demonstrate how his alleged injury occurred in the

15  manner he claimed. (*Id.* at 10-11.) Plaintiff counters summary judgment should not be granted

16  because he has established prima facie cases on both of his claims and there is sufficient

---

[7] UPS additionally provided brief argument that because Plaintiff's claims of pretext turn on "proven dishonesty" as a legitimate non-retaliatory reason and term of art in his collective bargaining agreement, his claims are preempted by § 301 of the Labor Management Relations Act. (Def.'s Mot. at 18-19.) But UPS fails to demonstrate how Plaintiff's claims are substantially dependent on an interpretation of "proven dishonesty," as defined by Plaintiff's CBA, for § 301 preemption to apply. *See Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1153 (9th Cir. 2019) (in determining whether a plaintiff's state law right is substantially dependent on analysis of a CBA, claims are only preempted to the extent there is an active dispute over "the meaning of contract terms." (citation omitted)). The mere need to "look to," "consider," "refer to," or "apply" a CBA does not result in § 301 preemption of a plaintiff's state law claims. *McCray v. Marriott Hotel Servs., Inc.*, 902 F.3d 1005, 1011, 1013 (9th Cir. 2018) (citing *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000)).

ORDER - 7

evidence in the record that demonstrates UPS's basis for his termination was pretext. (Pl.'s Resp. at 2-3, 17-21.)

A.   **Summary Judgment**

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the Court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. It is the nonmoving party's responsibility to "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted source omitted). The Court need not "scour the record in search of a genuine issue of triable fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but

ORDER - 8

1  it may consider other materials in the record."). Nor can the nonmoving party "defeat summary
2  judgment with allegations in the complaint, or with unsupported conjecture or conclusory
3  statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *see*
4  *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

### B.  Motions to Strike

First, UPS moves to strike several photographs Plaintiff submitted in his response to Defendant's Motion. (Def.'s Reply at 1-4.) The photographs submitted were taken on May 21, 2021 by Jaylee Harkness, Plaintiff's counsel's legal assistant, and concern the posture and condition of the chute handles, the placement of the chute handles in relation to the catwalk, the location where Plaintiff contends his injury occurred, and the position of the load stands. (Harkness Decl. (dkt. # 69) at ¶ 2, Exs. A (dkt. # 69-1) at 2-4, B (dkt. # 69-2) at 2-4, C (dkt. # 69-3) at 2-4, D (dkt. # 69-4) at 2-6, E (dkt. # 69-5) at 2-5, F (dkt. # 69-6) at 2.)

UPS argues that Plaintiff failed to produce, disclose, or otherwise supplement previous discovery, to disclose the photographs, and therefore, they should not be considered. (Def.'s Reply. at 1-3.) UPS additionally moves to strike a statement included in Ms. Harkness's declaration about the condition of the chute handles and a portion of Plaintiff's declaration that UPS alleges contradicts his previous testimony regarding whether he was on a load stand when he injured himself. (*Id.* at 3-4.)

Plaintiff argues UPS's motions to strike should be denied because no discovery was propounded that required supplementation, the existence of the photographs was known to UPS, and because some of the photographs were previously provided during Mark Sullivan's deposition. (Pl.'s Surreply at 3.) Plaintiff additionally argues that Ms. Harkness's statement about

ORDER - 9

the condition of the chute equipment should not be stricken because it was offered only as a means to categorize the photos. (*Id.*)

UPS's request to strike Plaintiff's submitted photographs is denied. Federal Rule of Procedure 26(a) requires parties to disclose all documents and tangible things that the disclosing party has in its possession, custody, or control that may be used to support its claims or defenses. Fed. R. Civ. P. 26(a)(1)(a)(ii). Generally, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . ." Fed. R. Civ. P. 37(c)(1). However, pertinent to the instant matter, under Federal Rule of Civil Procedure 26(e)(1):

> A party who has made a disclosure under [Fed R. Civ. P. 26(a)]—or who has responded to an interrogatory, request for production, or request for admission— must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, *and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process* . . . .

(emphasis added).

Here, it is clear from the record that UPS was aware of the photographs because Rebecca Shelton, local counsel for UPS, was present when they were taken. (*See* Second Hammack Decl. (dkt. # 76) at ¶ 6; Exs. H (dkt. # 76-3) at 2-3, JJ (dkt. # 76-4) at 2.) Some of the photographs were also previously provided and disclosed to UPS during Mr. Sullivan's deposition. (*Id.* at ¶ 7, Ex. KK (dkt. # 76-5) at 2-10.) Because the photographs were made known to UPS during the discovery process, Plaintiff did not have a duty to supplement its previous disclosure under Rule 26(a).[8]

---

[8] Nevertheless, Plaintiff's submitted photographs fail to create a genuine issue of material fact as to the condition or positioning of the chute handles because they fail to demonstrate the condition or positioning of the chute handles at the time Plaintiff claims that he was injured.

ORDER - 10

1	Next, UPS's request to strike a portion of Plaintiff's declaration is denied. Plaintiff's
2	submission in his declaration that he was on a load stand when he was injured does not
3	contradict his prior testimony. (*Compare* McCoy-Winston Decl. at ¶ 7 *with* Hammack Decl., Ex.
4	A at 16-17 (McCoy-Winston Dep. at 125:20-126:3).) In fact, Plaintiff explicitly testified to using
5	a load stand when he was injured. (*See* Hammack Decl., Ex. A at 16-17 (McCoy-Winston Dep.
6	at 125:20-126:3).) Though Plaintiff testified at his deposition, by reading the written statement
7	he provided to UPS at the time he was injured (Hammack Decl., Ex. A at 5 (McCoy-Winston
8	Dep. at 33:7-13)), Plaintiff's elaboration on the manner in which he was injured does not
9	demonstrate he contradicted prior testimony that merely repeats a previous written statement.

10	However, Ms. Harkness's statement regarding the condition of the chute handles should
11	be stricken. The Federal Rules of Evidence allow for opinion testimony from both lay and expert
12	witnesses. Fed. R. Evid. 701, 702. "It is necessary that a lay witness's opinions are based
13	upon . . . direct perception of the event, are not speculative, and are helpful to the determination
14	of factual issues before the jury." *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir.
15	2007) (citation and internal quotations omitted). Here, Ms. Harkness is Plaintiff's counsel's legal
16	assistant and has not testified to possessing any measure of technical knowledge related to the
17	condition of UPS's equipment or the chute handles. (*See* Harkness Decl. at ¶ 1.) Ms. Harkness's
18	statement also does not appear to be helpful to determining a fact at issue in this case. *See* Fed.
19	R. Evid. 701(b).

20	**C.	Wrongful Discharge**

21	Next, UPS argues that Plaintiff's wrongful discharge claim should be dismissed because
22	he fails to demonstrate UPS was motivated by retaliatory animus, that UPS's proffered reason
23	for his termination was pretextual, or that his pursuit of workers' compensation benefits was a

ORDER - 11

substantial factor motivating his termination. (Def.'s Mot. at 11-17.) Plaintiff counters he has established a prima facie case for wrongful discharge, and that there is sufficient evidence of pretext in the record because UPS's investigation was not to correct a safety hazard, but to serve as a means to terminate his employment. (Pl.'s Resp. at 3, 20-21.)

"The tort for wrongful discharge in violation of public policy is a narrow exception to the at-will doctrine." *Erickson v. Biogen, Inc.*, 417 F.Supp.3d 1369, 1386 (W.D. Wash. 2019) (citing *Becker v. Cmty. Health Sys., Inc.*, 184 Wn.2d 252, 258 (2015)). Wrongful discharge in violation for public policy has generally been limited to four situations: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing." *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936 (1996) (citing *Dicomes v. State*, 113 Wn.2d 612, 618 (1989)).

In Washington, to prevail on a claim for wrongful discharge in violation of public policy, "a plaintiff must demonstrate that his or her discharge may have been motivated by reasons that contravene a clear mandate of public policy." *Martin v. Gonzaga University*, 191 Wn.2d 712, 723 (2018) (citation and internal quotations omitted). Under a burden shifting framework, the plaintiff must first make a prima facie showing that: (1) their discharge was motivated by reasons that contravene a clear mandate of public policy; and (2) "the public-policy-linked conduct was a 'significant factor' in the decision to discharge" him. *Id.* at 725 (quoting *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 75 (1991)). A plaintiff can make such a demonstration through circumstantial evidence, which includes proximity in time between the claim and his

firing, in addition to satisfactory work performance and evaluations. *Id.*; *Wilmot*, 118 Wn.2d at 69-70.

If the plaintiff makes this prima facie showing of wrongful termination, the burden shifts to "the employer to articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Martin*, 191 Wn.2d at 725-26. If the employer meets this burden of production, then the burden swings back to the plaintiff.[9] *Id.* at 726. The plaintiff must then show that the reason was "pretextual, or by showing that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was nevertheless a substantial factor motivating the employer to discharge the worker." *Id.* (citation and quotations omitted).

In this case, Plaintiff has properly alleged a prima facie case that he was discharged for reasons that contravene a clear mandate of public policy—his filing of a workers' compensation claim—and that it was a significant factor in UPS's decision to terminate his employment. Plaintiff's termination was proximate in time to his injury. Immediately upon learning of Plaintiff's claim of injury, UPS began an investigation that ultimately determined Plaintiff should be fired on the basis that he was dishonest about his injury. Though there appears to be some evidence in the record as to Plaintiff's "high level of lateness and absenteeism" (Victorian Decl., Ex. C at 17-18), Plaintiff was employed with UPS for approximately eight years at the time of his termination and there is no evidence that UPS sought to terminate him due to his attendance record. (*See* Victorian Decl., Ex. C at 17-18; Hammack Decl., Ex. A at 7-10 (McCoy-Winston Dep. at 50:11-16, 50:18-21, 52:2-4, 70:18-25).) As such, it appears that Plaintiff had been performing to UPS's satisfaction up until his injury claim arose.

---

[9] The employer's burden is a burden of production, and not persuasion. *Martin*, 191 Wn.2d at 725-26. The employer must produce relevant admissible evidence of another motivation but need not do so by a preponderance of evidence. *Id.* (internal citations and quotations omitted).

ORDER - 13

Next, the burden shifts to UPS to produce evidence of legitimate, nonretaliatory reason for the discharge. Here, UPS has produced evidence that Plaintiff was fired for "proven dishonesty" because Plaintiff's injury could not have occurred as he alleged based on his height, and the height and condition of the chute handles. (Hammack Decl., Exs. Q at 2-5, R at 2-4, S at 2; Victorian Decl., Exs. E at 22-23 (Hell Dep. at 100:25-101:11), F at 5-6 (Christopher Dep. at 68:21-69:19).)

Given UPS's proffered reason, the burden shifts back to Plaintiff to show UPS's reason is pretextual, or that despite UPS's legitimate reason to fire him, the public-policy-linked conduct nevertheless was a substantial factor motivating his discharge. A plaintiff satisfies his burden to show pretext by offering sufficient evidence to create a genuine dispute of material fact that either: (1) the defendant's stated reason is false; or (2) although the defendant's reason is legitimate, retaliation was still a substantial factor motivating the adverse employment action. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 446-47 (2014) (citation omitted). An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production. *Id.* at 447. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Shokri v. Boeing Co.*, 311 F.Supp.3d 1204, 1221 (W.D. Wash. 2018) (citation and internal quotations omitted).

Here, Plaintiff's alleges, *inter alia*, that UPS conducted a flawed investigation of Plaintiff's injury, Plaintiff's injury could still happen in the manner he alleges based on the condition of the chute handles, and that the UPS manager and supervisors tasked with the investigation were financially motivated to reduce loss time claims. (*See* Pl.'s Resp. at 17-20.) Based on the record before the Court, Plaintiff has provided sufficient evidence demonstrating genuine issues of material fact concerning whether UPS's proffered reason of "proven

ORDER - 14

dishonesty" was pretext. First, though UPS claims its investigation was primarily focused on determining the root cause of Plaintiff's injury, it is clear from the record and from the nature of the investigation conducted that UPS officials had additional considerations in mind. Specifically, the record evinces that UPS officials were unambiguously concerned about the potential impact of Plaintiff's injury being charged as a "loss time" injury and about otherwise "eating the charge" for his injury. (*See* Hammack Decl., Ex. Q at 3; Victorian Decl., Ex. C at 24.) And rather than merely investigate how the chute handle may have injured Plaintiff to determine if a safety issue existed, UPS sought out information on recent police activity involving chest trauma to determine the veracity of his claim. (*See* Victorian Decl., Ex. C at 17-18.) It therefore appears UPS sought out reasons to conclude that "proven dishonesty" occurred rather than merely seek out to uncover any potential safety threats after Plaintiff's injury.

Second, there are genuine issues of material fact throughout the record relating to whether Plaintiff's injury could have occurred in the manner alleged. As noted above, UPS has provided evidence that Plaintiff's injury could not have occurred due to his height relative to the height of the chute handles and that there is no work order history of a malfunctioning chute handle at the time of Plaintiff's injury. (*See* Hammack Decl., Exs. Q at 2-5, R at 2-4, S at 2; Victorian Decl., Exs. B, at 6, E at 22-23 (Hell Dep. at 100:25-101:11), F at 5-6 (Christopher Dep. at 68:21-69:19).) At the same time, the record demonstrates there were known issues, as noted by Mr. Sullivan and Plaintiff's coworkers, with the chute handles being regularly broken or leaking hydraulic fluid such that they could be hanging in a lower position. (*See* McCoy-Winston Decl. at ¶ 7; Hammack Decl., Exs. F at 13-15 (Sullivan Dep. at 39:8-40:10, 43:1-20), I at 2, J at 2.) There is also some question raised by the evidence as to how the presence of a load stand may have affected Plaintiff's ability to strike a chute handle with his chest. Moreover, despite UPS's

ORDER - 15

position that Plaintiff's "proven dishonesty" was the basis for his termination, Mr. Hell's email to Mr. McKenzie indicating that "there was not a proven dishonesty w/l on site" further clouds the record on Plaintiff's termination. (Hammack Decl., Ex. W at 2.) Despite UPS's proffered interpretation at oral argument, there is no clear explanation in the record from Defendant as to the meaning of Mr. Hell's comment.

Finally, there is disputed evidence in the record related to whether Plaintiff's termination may have been financially motivated. Mr. McKenzie and Mr. Aholelei both testified that they were incentivized in some form or manner to minimize employee injuries or "loss time" claims and, as documented previously, it is clear that this was a major concern for Mr. McKenzie. (*See* Hammack Decl., Ex. B at 10-11 (McKenzie Dep. at 68:9-20, 70:11-71:2), Ex. E at 5 (Aholelei Dep. at 46:3-23).) On the other hand, Mr. Christopher testified that though workers' compensation claim costs are accounted for in a hub's budget, UPS managers are not held financially responsible or otherwise reviewed for such costs. (Hammack Decl., Ex. D at 5-6 (Christopher Dep. 73:13-74:10).) Given this record, the Court additionally finds there are genuine issues of material fact concerning the incentive to Plaintiff's managers in keeping employee injuries and "loss time" claims to a minimum and whether this may have provided UPS motivation to terminate him from his employment.

Accordingly, Plaintiff has provided sufficient evidence to provide a basis for a reasonable juror to conclude that UPS's stated reason of "proven dishonesty" was pretext.

**D.    Workers' Compensation Violation**

Finally, Plaintiff argues that after filing for workers' compensation benefits, he was immediately investigated and fired, which establishes a prima facie case of retaliation for filing a workers' compensation claim. (Pl.'s Resp. at 16-17.) Under Washington law, an employee

ORDER - 16

cannot be discharged or discriminated against for filing a workers' compensation claim. RCW 52.48.025(1). To establish a prima facie case of a workers' compensation violation, the plaintiff must demonstrate: (1) he exercised his workers' compensation rights; (2) he was terminated; and (3) a causal connection between the exercise of the legal right and the discharge. *Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 490-91 (2004). "Proximity in time between the protected activity and the employment action when coupled with evidence of satisfactory work performance supports an assertion of retaliatory motive." *Id.* at 491 (citing *Wilmot*, 118 Wn.2d at 69.)

In recognition of the difficulty of proving motive in such cases, Washington courts allow an employee to establish the causation element by merely showing he filed a workers' compensation claim, that the employer had knowledge of the claim, and that the employee was discharged. *Anica*, 120 Wn. App. at 491. Once a prima facie showing is made, the burden then shifts to the employer who must offer a legitimate reason for the discharge that is not pretext or retaliation. *Id.* at 492. If the employer's burden is met, it then shifts back to the employee to show the reason offered by the employer was pretext or by showing that although legitimate, the employee's pursuit of workers' compensation benefits was a substantial factor motivating the employer to fire the employee. *Id.*

Here, Plaintiff has established a prima facie case for workers' compensation violation under RCW 51.48.025. The first two prongs are met as it is clear Plaintiff filed a workers' compensation claim and that his employment was subsequently terminated by UPS. Furthermore, there is evidence of a causal connection between Plaintiff's claim and termination because shortly after UPS discovered Plaintiff had filed a claim, UPS immediately began an investigation and determined termination was appropriate. Finally, for the same reasons

considered previously in addressing Plaintiff's wrongful discharge claim, the Court finds genuine issues of material fact exist as to UPS's motivation to terminate him and whether its proffered reason was pretext for his claim pursuant to RCW 51.48.025.

## IV.   CONCLUSION

For the foregoing reasons, the Court hereby orders:

(1)   Defendant's Motions to Strike (dkt. # 72) are GRANTED in part and DENIED in part. Defendant's Motion to Strike the portion of Ms. Harkness's declaration relating to the condition of the chute handle is GRANTED. Defendant's Motion to Strike Plaintiff's submitted photographs and the requested portion of Plaintiff's declaration is DENIED.

(2)   Defendant's Motion (dkt. # 64) is DENIED.

(3)   The Clerk is directed to send a copy of this Order to the parties.

Dated this 15th day of March, 2022.

MICHELLE L. PETERSON
United States Magistrate Judge

ORDER - 18